UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 05-2310(DSD/JJG)


Best Buy Stores, L.P.,

             Plaintiff,

v.                                                          **ORDER**

Developers Diversified Realty
Corporation, DDR GLH, LLC.;
Benderson-Wainberg Associates, LP;
DDR MDT Cool Springs Point LLC;
DDRA Ahwatukee Foothills, LLC;
DDR Flatiron LLC; DDRA Community
Centers Four, LP; DDR MDT Lakepointe
Crossing, LP; DDR MDT Great Northern,
LLC; DDR MDT Shoppers World, LLC;
DDR MDT Riverdale Village Outer Ring,
LLC; DDR Hendon Nassau Park II, LP;
DDRC PDK Salisbury LLC,

             Defendants.


        Thomas C. Mahlum, Esq., Mpatanishi S. Tayari Garrett,
        Esq., Joel Mintzer, Esq. and Robins, Kaplan, Miller &
        Ciresi, 2800 LaSalle Plaza, 800 LaSalle Avenue,
        Minneapolis, MN 55402 and Robert A. Machson, Esq., 7
        White Birch Ridge, Weston, CT 06883, counsel for
        plaintiff.

        James L. DeFeo, Esq., Jennifer A. Fleming, Esq., Steven
        S. Kaufman, Esq., Thomas L. Feher, Esq. and Thompson
        Hine, LLP., 3900 Key Center, 127 Public Square, Cleveland
        OH 44114; Marc J. Zwillinger, Esq., 1301 K Street N.W.,
        Suite 600, Washington, D.C. 20005 and D. Charles
        Macdonald, Esq., Martin S. Chester, Esq. and Faegre &
        Benson, 2200 Wells Fargo Center, 90 South Seventh Street,
        Minneapolis, MN 55402, counsel for defendants.



        This matter is before the court on plaintiff's and defendants'

separate motions for partial summary judgment.  After a review of

the file, record and proceedings herein, and for the following reasons, the court grants both motions in part.

## BACKGROUND

In this commercial landlord-tenant dispute, plaintiff Best Buy Stores, L.P. ("Best Buy") alleges that it was overcharged for insurance-related costs under various lease agreements. Best Buy is the largest consumer electronics retailer in the United States. Defendant Developers Diversified Realty Corporation ("DDRC") is a publicly traded real estate investment trust that owns and manages numerous shopping centers. Pursuant to various lease agreements, Best Buy rented fifteen retail properties between 1998 and 2005 from the following defendants: DDRA Ahwatukee Foothills, L.L.C. ("Ahwatukee"); DDR MDT Fayetteville Spring Creek, L.L.C. ("Spring Creek"); DDR Flatiron, L.L.C. ("Flatiron"); JDN Realty Corp;[1] DDR MDT Turner Hill Marketplace, L.L.C. ("Turner Hill"); DDR PDK Salisbury, L.L.C. ("Salisbury"); DDR MDT Shoppers World, L.L.C. ("Shoppers World"); DDR MDT Riverdale Village Outer Ring, L.L.C. ("Riverdale"); DDR Hendon Nassau Park II, L.P. ("Nassau Park"); Benderson-Wainberg Associates, L.P. ("B-W"); BG Boulevard III, L.L.C. ("Boulevard"); DDR MDT Great Northern, L.L.C. ("Great Northern"); DDR MDT Cool Springs Pointe, L.L.C. ("Cool Springs");

---

[1] JDN Realty Corp. owned properties in Douglasville, Georgia ("JDN Douglasville") and Chattanooga, Tennessee ("JDN Overlook").

DDR MDT Lakepointe Crossing, L.P. ("Lakepointe") (collectively "landlord defendants").[2] The landlord defendants were distinct legal entities that DDRC owned in whole or in part. DDRC managed the properties pursuant to separate management agreements with each landlord defendant.

Subject to certain variations, the lease agreements generally required the landlord defendants to obtain property and liability insurance for the common areas of the shopping centers and Best Buy to reimburse its pro rata share of the cost of insurance. (See Pl. Exs. 1 arts. 9(F), 9(H); 2 art. 22.2; 3 art. 22.6; 4 art. 22.2; 5 art. 22.2; 6 arts. 4, 19; 7 art. 22.2; 8 art. 22.2; 9 art. 23.2; 10 art. 22.2; 11 art. 22.2; 12 art. 12.7; 13 art. 13(A); 14 art. 23(b); 15 art. 22.2.) As property manager, DDRC procured blanket insurance policies with high deductibles - typically $100,000 - from third-party commercial insurance companies for all of the properties that it managed.[3] DDRC assumed responsibility for losses within the deductible ("first dollar program"[4]) and billed

---

[2] The relevant lease years are as follow ("lease years"): Ahwatukee (2000-05); Spring Creek (2002-05); Flatiron (2004-05); JDN Douglasville (2003-05); JDN Overlook (2003-05); Turner Hill (2003-05); Salisbury (2004-05); Shoppers World (2000-05); Riverdale (2002-05); Nassau Park (1998-2005); B-W (2004-05); Boulevard (2004-05); Great Northern (1998-2005); Cool Springs (2000-05); Lakepointe (2002-05). (Def. Ex. N.)

[3] A blanket insurance policy is a single policy that covers multiple locations.

[4] DDRC referred to this as the "first dollar program" because
(continued...)

the landlords for taking on that risk ("first dollar premiums").
The landlords in turn billed the tenants for their proportionate
cost of the first dollar premiums. DDRC determined the amount to
charge the landlords, relying on market indicator letters from
insurance companies that provided estimates for a first dollar
insurance policy.[5] Most of the insurance companies, however,
expressed that they would not issue such policies, and DDRC
generally charged less than the quoted prices. During the lease
years, DDRC billed substantially more for first dollar premiums
than it paid out in claims.

## A. DDRC's Billing and Disclosures

As early as March 3, 1999, Best Buy received a 1998 memorandum
from DDRC explaining "the self-funded insurance program that is
maintained by [DDRC]."[6] (Pl. Ex. 112.) The memorandum stated
that:

> In addition to the standard variables
> considered by the insurer to establish the
> premium for the public liability and property
> damage coverage, [DDRC] has been able to
> negotiate significant reductions of the

---

[4](...continued)
DDRC paid the first dollar of loss.

[5] The parties dispute the manner in which DDRC used the
indicator letters. Best Buy maintains that the letters were used
to determine and justify the first dollar premiums. Defendants
indicate that the letters merely ensured that the charges were
reasonable.

[6] Best Buy received the memorandum during negotiations for a
lease not at issue in this case

premium by agreeing to self fund the first $100,000 of public liability claims, inclusive of attorney fees, court costs and related expenses, and the first $25,000 of property loss, before the insurer would be required to pay any excess loss.... Because of its obligation to self fund the initial $100,000 of public liability claims and $25,000 of property damage claims, [DDRC] is given more control over the administration and resolution of its claims which helps to maintain the lower premium regardless of fluctuations in the marketplace. This self-funded coverage, while similar to a deductible, is not, in fact, a deductible....

While [DDRC] has assumed 100% of the risk for self-funded and uninsured losses, this risk is not passed on to the shopping center tenants who are obligated to reimburse the landlord its prorata share of insurance. Instead, [DDRC] includes in its insurance billing to its tenants a self-funded allocation which is intended to compensate [DDRC] for assuming 100% of the risk for self-funded and uninsured loss. However, the aggregate cost of the premium and the self-funded allocation is less than the cost for first dollar coverage for each property on a "stand alone" basis (i.e. insurance quoted on a single property basis rather than a blanket policy basis for multiple properties) under a standard commercial policy with no self-funded reimbursement obligation by the insured. It should also be noted that while many insurance companies may be willing to quote a price for first dollar or higher deductible coverage, most insurance companies are unwilling to actually issue a policy of this nature due to the higher risks involved in insuring only a single property. Additionally, tenants should be made aware that its prorata share of the premium and self-funded allocation is the only insurance obligation the tenant is required to pay during the fiscal year. Most landlords who maintain standard commercial insurance policies with deductibles will include with the annual common area maintenance ("CAM")

> charge any dollars the landlord is required to
> pay for legal expense and/or deductible
> payments in addition to the prorata share of
> the higher premium. Therefore, the tenant
> pays its prorata share of the premium, plus
> any out-of-pocket expenses incurred by the
> landlord to pay the deductible portion of
> coverage and legal expenses, if applicable.
> This amount is not fixed and could
> significantly increase the tenant's CAM
> charge.

(Id.)

Near the beginning of each lease year, DDRC provided budgets to Best Buy on behalf of the landlord defendants anticipating the amount Best Buy would be billed in the coming year for CAM and insurance. DDRC then billed Best Buy monthly pursuant to that budget. Several months after the conclusion of each lease year, DDRC submitted documents to Best Buy either requesting additional payments because the actual costs exceeded the budget or crediting overpayments ("reconciliation documents"). The reconciliation documents did not explain how the insurance charges were calculated.

The reconciliation documents for the 1998 and 1999 lease years noted that the insurance allocations "include premiums collected by Mesirow Insurance Services and funding for large deductibles collected by DDRC." (Defs. Ex. O.) That language was altered in the 2000 and 2001 lease years to provide that the insurance allocations "include premiums and funding for large deductibles. Premiums are collected by Mesirow Insurance Services. Funding for

large deductibles [is] collected by DDRC."[7]  (Defs. Ex. P.)  In 2002 and 2003, DDRC included a separate line item identifying the "deductible cost."  In addition, the reconciliation documents noted that "[i]nsurance company costs collected by Mesirow Insurance Services.  Self-Insured Deductible costs charged for and collected by DDRC."[8]  (Defs. Ex. Q.)  The 2004 reconciliation documents provided a "First Dollar Program Cost Summary."  This summary identified the charges for the first dollar premiums and noted that DDRC's "program provides first dollar coverage to Tenants for incurred General Liability and Property losses.  In the event of an insured loss, incurred losses are not charged back to a Tenant but retained by [DDRC]."  (Defs. Ex. R.)

For the 2005 lease year, DDRC created two captive insurance companies – American Property Protection Company ("APPC") and National Property Protection Company ("NPPC") – to provide the

---

[7] The 2000 reconciliation documents for Great Northern could not be produced.  Nevertheless, Best Buy does not challenge the attestation by DDRC's due diligence supervisor that she believed "DDRC followed its standard practices and issued [the documents] to Best Buy for the 2000 calendar years."  (Goodrich Aff. ¶ 13.)

[8] DDRC purchased the JDN Douglasville, JDN Overlook and Turner Hill properties in 2003 and provided the landlords for these properties with a reforecasted budget indicating that "[i]nsurance expense is for insurance coverage for both liability and property damage, and includes the cost of premiums paid to insurers and self funded deductible amounts."  (Defs. Exs. T, U, V.)  DDRC considered sending the 1998 memorandum to the tenants but chose to omit it because "the least said the better."  (Pl. Ex. 126.)

first dollar coverage ("captive coverage").[9]  DDRC paid premiums ("captive premiums") to the captive insurance companies for insuring the within-deductible risk and billed the landlord defendants for those premiums.  The landlord defendants then billed Best Buy its pro rata share of the premiums.[10]  The reconciliation documents again explained the first dollar program using language nearly identical to the 2004 documents but replaced "retained" with "absorbed."  In addition, the 2005 documents included invoices from NPPC or APPC indicating that the charges were for first dollar premiums.  (Defs. Ex. S.)

**B.  Best Buy's Review Process and Objections**

Before 2000, Best Buy paid its rent only after a thorough review of the documentation provided by DDRC, which often resulted in Best Buy making late payments.  Best Buy changed its review process in 2000 to ensure timely payments.  Under the new process, an operating expense analyst ("OEA") at Best Buy conducted a first-

---

[9] The captive insurance companies were formed as "pure captive" companies under Vermont law, which defines such companies as "any company that insures risks of its parent and affiliated companies or controlled and unaffiliated business." Vt. Stat. tit. 8, § 6001(14).

[10] To avoid losing its special tax status as a real estate investment trust, DDRC took certain measures to ensure that no transfer of risk occurred between the captive insurance companies and the properties that DDRC only partially owned.  First, the captive insurance companies' payment obligations were limited to the amount of premiums received.  Second, an aggregate cap was placed on the amount of losses covered by the captive insurance companies.  Third, DDRC guaranteed any claims that the captive insurance companies could not pay.

level audit, reviewing the reconciliation documents for obvious errors. A manager then performed a similar review and issued payment if no errors were discovered. Along with the payment, Best Buy sent a standard form letter ("objection letter") to the landlord noting that the property may be subject to a more thorough audit in the future and stating that "if Tenant is required to object to the reconciliation in order to preserve the right to audit, please allow this notice to serve as said objection, pursuant to the terms of the Lease."[11] (Pl. Ex. 124.) The letter continued:

> It is understood and agreed that this payment shall not be deemed as an approval of inappropriate charges that are inconsistent with the provisions of the Lease, charges that may require specific approval, or the manner and method which Best Buy's share of expenses has been calculated. It is agreed that by accepting the payment enclosed, Best Buy preserves any and all audit rights it may have, including all rights in our Lease or Operating Agreement.

(Id.)

Thereafter, a property management analyst ("PMA") conducted a more thorough second-level audit to determine whether a full audit was required. The PMA considered the policy type, charges outside of premiums and lack of documentation to determine whether to dispute a charge. (Defs. Ex. FF at 181.) According to Best Buy's

---

[11] Only three leases required Best Buy to object to the reconciliation documents within a specified time: Ahwatukee (thirty days); Nassau Park (CAM costs within ninety days); and B-W (same).

lease audit manager, the time between Best Buy receiving the reconciliation documents until completion of the second-level audit "could take more than a year ... could take less than a year," and on occasion has taken longer than two years. (Pl. Ex. 121 at 12, 59.)

In addition to the generic objection letters, Best Buy made other representations related specifically to the insurance charges. In a May 3, 2000, letter, Best Buy indicated that it was "unable to process" an invoice for the Ahwatukee property, and requested "copies of invoices paid for CAM and insurance expenses." (Pl. Ex. 130.) In a June 19, 2000, letter to Great Northern, Best Buy requested copies of the 1999 CAM invoices and a "certificate of insurance showing coverage for this time period and a copy of the premium invoice from the carrier detailing property insurance and general liability." (Pl. Ex. 131.) Finally, on September 28, 2004, counsel for Best Buy wrote to DDRC indicating that Best Buy had repeatedly attempted without success to obtain "backup information" for the CAM insurance charges during the previous year. The letter requested invoices showing the premium amount for the regular and umbrella policies, proof of the actual claim costs incurred, data showing calculation of developed and trended losses, a detailed explanation of handling and administrative expenses, a list of all policies of insurance and the properties covered and a

copy of the relevant portions of each policy.[12]  (Pl. Ex. 133.)

DDRC produced none of the requested information until after

commencement of this litigation.

Best Buy's fifth amended complaint asserts claims for breach

of contract and declaratory judgment against the landlord

defendants and breach of fiduciary duty and fraud against all

remaining defendants.[13]  On November 21, 2007, the court dismissed

the fraud claims against B-W, Nassau Park, Cool Springs, Salisbury,

Boulevard, Riverdale, Great Northern, Turner Hill and JDN

Douglasville.  Best Buy moves for summary judgment on its breach of

contract, declaratory judgment and breach of fiduciary duty claims.

Defendants move for summary judgment on the breach of contract,

breach of fiduciary duty and fraud claims.

---

[12] Best Buy also cites a spreadsheet prepared by DDRC noting
that "Best Buy began questioning their insurance allocations during
1998-1999 and no one at DDR responded." (Pl. Ex. 127.)  The only
foundation for this spreadsheet, however, comes from Richard
Boening - DDRC's senior supervisor for collections and tenant
accounts - who indicated that he prepared the spreadsheet in
December 2005 with the sole intent to "characterize the allegations
that [Best Buy] was making through its counsel."  (Boening Aff.
¶¶ 2-4.)  Accordingly, the court disregards the spreadsheet.

[13] The fifth amended complaint also named DDRA Community
Centers Four L.P. and KLA/SM, L.L.C. as landlord defendants.  Those
parties were later dismissed with prejudice pursuant to
stipulation.  (Doc. No. 649.)

**DISCUSSION**

**I.  Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

## II.  Breach of Contract and Declaratory Judgment

### A.  Substantive Claims

In this case, Best Buy does not argue that the high-deductible blanket insurance policies violated the lease agreements.  Rather, the sole issue is whether Best Buy was properly charged under the lease agreements for the first dollar and captive premiums.

"The cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract."  Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997).[14] Construction of an unambiguous contract is a legal question for the court, while construction of an ambiguous contract is a factual question for the jury.  See Denelsbeck v. Wells Fargo & Co., 666

_____

[14] The lease agreements for the following properties contain choice-of-law provisions that require application of various states' laws to all of Best Buy's claims: Ahwatukee (Arizona); Spring Creek (Arkansas); Flatiron (Colorado); JDN Douglasville, Turner Hill (Georgia); Shoppers World (Massachusetts); Riverdale (Minnesota); Great Northern (Ohio); Lakepointe (Texas).  Consistent with the court's choice-of-law analysis in the December 2006 order, the court applies Minnesota law to the remaining defendants unless an outcome determinative conflict exists between the laws of Ohio and Minnesota.  (Doc. No. 177 at 13-16.)  Nevertheless, the court states only Minnesota contract interpretation law because, with the two exceptions noted in footnote fifteen, the other relevant states apply materially similar principles.  See Johnson v. Earnhardt's Gilbert Dodge, Inc., 132 P.3d 825, 828 (Ariz. 2006); Health Res. of Ark. v. Flener, 374 Ark. 208, 211 (Ark. 2008); Hoang v. Assur. Co. of Am., 149 P.3d 798, 801 (Colo. 2007); Boardman Petroleum v. Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga. 1998); Ucello v. Consentino, 235 N.E.2d 44, 47 (Mass. 1968); City of St. Marys v. Auglaize County Bd. of Comm'rs, 875 N.E.2d 561, 566 (Ohio 2007); Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003).

N.W.2d 339, 346 (Minn. 2003) (citations omitted).  Whether a

contract is ambiguous is a question of law for a court to decide.

Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d

349, 354 (Minn. 1979) (citations omitted).  A contract is ambiguous

if "it is reasonably susceptible to more than one interpretation."

Art Goebel, Inc., 567 N.W.2d at 515 (citation omitted).  "Where the

parties express their intent in unambiguous words, those words are

to be given their plain and ordinary meaning."  Motorsports Racing

Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 323 (Minn.

2003) (citation omitted).  A court determines whether a contract is

ambiguous "based solely on the language of the contract."  Maurice

Sunderland Architecture, Inc. v. Simon, 5 F.3d 334, 337 (8th Cir.

1993) (citing ICC Leasing Corp. v. Midwestern Mach. Co., 257 N.W.2d

551, 554 (Minn. 1977)).[15]

---

[15] Arizona and Colorado permit a court to consider extrinsic
evidence to determine whether a contract is ambiguous.  See, e.g.,
Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1140
(Ariz. 1993) (court considers extrinsic evidence offered to
interpret contract if contract language is "'reasonably
susceptible' to the interpretation asserted by its proponent"); E.
Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co., 109
P.3d 969, 974 (Colo. 2005) ("[E]xtrinsic evidence may be
conditionally admitted to determine whether the contract is
ambiguous." (citation omitted)).  Defendants also note that
Massachusetts permits consideration of extrinsic evidence to
determine whether a contract is ambiguous.  (Def. Opp'n Mem. at 18
n.12.)  In Massachusetts, however, when "the words of a contract
are clear, they must be construed in their usual and ordinary
sense, and [a court does] not admit parol evidence to create an
ambiguity when the plain language is unambiguous." Gen. Convention
of the New Jerusalem in the U.S.A., Inc. v. MacKenzie, 874 N.E.2d
1084, 1087 (Mass. 2007).

None of the lease agreements defines "insurance." Nonetheless, Best Buy argues that the landlord defendants breached the lease agreements by billing it for the first dollar and captive premiums because the lease agreements unambiguously permitted the landlord defendants to charge only for the cost of procuring and maintaining insurance from third-party commercial insurance companies.[16] Moreover, Best Buy maintains that, even if the lease agreements are ambiguous, the first dollar program and captive coverage do not satisfy the landlord defendants' broad definition of "insurance" because they do not pool and transfer risk between DDRC and the landlord defendants. In response, the landlord defendants contend that the lease agreements permitted them to charge Best Buy for "costs attendant to insuring the properties whether through a licensed third-party commercial [insurance] carrier or not," (Def. Mem. Opp'n at 16), and that the first dollar program and captive coverage satisfy the lease agreements' "insurance" requirements.

### 1. Salisbury

The Salisbury lease agreement provided that Salisbury's

> costs to maintain the common areas shall
> include and be limited to all amounts paid by

---

[16] Best Buy does not assert that the landlord defendants breached the lease agreements because they did not actually incur the costs for the first dollar and captive premiums. (See Pl. Mem. Opp'n at 63 ("Whether the Landlord Defendants incurred the expenses or not is simply not critical to any of Best Buy's claims that Best Buy was billed for 'insurance' that was not insurance.").)

[Salisbury], during the lease term, for ...
(d) commercial general liability insurance on
the common areas [that names Best Buy] as an
additional insured[,] and [Salisbury is] to
furnish [Best Buy] upon request with a
Certificate of Insurance as evidence thereof,
[and] (e) casualty insurance required to be
maintained by [Salisbury] under Article 19
below with respect to the Demised Premises and
the Shopping Center.

(Pl. Ex. 6 art. 14.)  Article 19 stated that

[d]uring the term of this lease, [Salisbury]
shall maintain all risk fire and extended
coverage insurance ... Such policy shall
provide a maximum deductible amount of Fifty
Thousand    Dollars    ($50,000.00)    ....
Certificates evidencing such insurance shall
be delivered to [Best Buy] prior to the Date
of Occupancy by [Best Buy], and prior to the
expiration of any such policies [Salisbury]
shall deliver renewal certificates thereof to
[Best Buy].  All of [Salisbury's] insurance
policies shall be carried with companies
licensed to do business in the state in which
the Demised Premises is located with a rating
of 'A VIII' or better as set forth in the most
current issue of Best's Insurance reports.

(Id. art. 19.)  The agreement further required Best Buy to "pay its

proportionate share of ... insurance and common area costs for the

Shopping Center."  (Id. arts. 4, 14.)

Best Buy's requirement to pay its "proportionate share of

insurance" cannot be read to encompass all costs - whatever they

may be - attendant to insuring the properties.  Rather, under the

plain meaning of the lease agreement, Best Buy is responsible

solely for its share of the actual insurance that the lease

agreement required Salisbury to maintain.  It is also undisputed

16

that DDRC, APPC and NPPC are not insurance companies licensed to do business in Maryland. Moreover, because the first dollar program and captive coverage were not commercial insurance policies, Best Buy was not named as an additional insured on the commercial general liability insurance and no certificates of insurance could be provided. Therefore, Salisbury breached the unambiguous terms of the lease agreement, and summary judgment is warranted on Best Buy's breach of contract and declaratory judgment claims against Salisbury.

### 2. JDN Overlook

The JDN Overlook lease agreement addressed insurance in several different articles. Article 12 required JDN Overlook to "carry, at its expense, public liability insurance coverage on all Common Areas ... of the shopping center, with a contractual liability endorsement on the policy in a company qualified to transact business in the state in which the demised premises are located," and to provide Best Buy "[c]ertificates of such coverage from the insurer providing thirty (30) days notice prior to cancellation or termination." (Pl. Ex. 13 art. 12.) Article 17 provided that JDN Overlook "agrees to carry fire and extended coverage insurance on [Best Buy's] building and all other buildings within the shopping center." (Id. art. 17.) Article 18 mandated that the insurance carried by JDN Overlook "on its building occupied by [Best Buy] shall contain a waiver of subrogation clause

17

waiving the right of recovery by the insurance company or companies from [Best Buy]." (Id. art. 18.) Article 13 required Best Buy to pay its pro rata share of the CAM expenses, including "the cost of public liability, personal and bodily injury and property damage liability insurance coverage covering the common areas." (Id. art. 13(A).) Similarly, Best Buy agreed in article 31 to pay its "pro rata share of the fire and extended coverage insurance premiums paid by [JDN Overlook]." (Id. art. 31.)

Similar to the Salisbury lease agreement, the plain and unambiguous terms of the JDN Overlook lease agreement required Best Buy to pay only its proportionate share of the insurance, not the costs attendant to insuring the properties. Furthermore, the lease agreement expressly required JDN Overlook to provide public liability insurance coverage for the common areas with a contractual liability endorsement from an insurance company qualified to do business in Tennessee and certificates of coverage from the "insurer." Additionally, the property insurance carried by JDN Overlook on Best Buy's building had to contain a waiver of subrogation by the "insurance company or companies" waiving their right to recover from Best Buy. A plain reading of these provisions establishes that the lease agreement contemplated insurance from a third-party commercial insurance company. Because the first dollar program and captive coverage do not satisfy this requirement, the court determines that JDN Overlook breached the

lease agreement by charging for expenses not provided for in the lease agreement. Accordingly, summary judgment on Best Buy's breach of contract and declaratory judgment claims against JDN Overlook is warranted.

### 3. Ahwatukee

Under the lease agreement, Ahwatukee was required to,

> as a component of Common Area Expenses, maintain in effect a policy or policies of insurance covering the building of which the Premises are a part ... In addition, [Ahwatukee] shall maintain, as a component of Common Area Expenses, commercial general liability insurance ... insuring against any and all liability of [Ahwatukee] with respect to the operation and use of the Shopping Center. [Ahwatukee's] obligation to carry the insurance required in this Article 9F may be brought within the coverage of any so-called blanket policy or policies of insurance carried and maintained by [Ahwatukee], provided that the coverage afforded will not be reduced or diminished by reason of the use of such blanket policy of insurance.

(Pl. Ex. 1 art. 9(F).) The lease agreement required Best Buy to reimburse "the cost to [Ahwatukee] of the insurance required to be maintained by [Ahwatukee] under Article 9F," and set forth the manner in which Best Buy's share of the insurance would be calculated if the cost of the insurance was "not separately charged to [Ahwatukee] by [Ahwatukee's] insurance carrier." (Id. art. 9(H).)

Consistent with the Salisbury and JDN Overlook lease agreements, the court rejects the argument that Best Buy was

responsible for its proportionate share of all costs attendant to insuring the relevant properties. In addition, although article 9(F) does not expressly state that the property and liability insurance were to be maintained by a third-party commercial insurance company, article 9(H) explicitly contemplated that the costs for the "insurance [Ahwatukee was] required to maintain under Article 9F" be charged to Ahwatukee by its "insurance carrier." The court finds that the plain meaning of insurance carrier is a third-party commercial insurance company. Moreover, in article 9(B), Ahwatukee and Best Buy waived "for themselves and on behalf of their respective insurance companies ... any right of subrogation that any such insurance company may have." (Id. art. 9(B).) This statement similarly suggests that the insurance obligations in the lease agreement contemplated insurance obtained from a third-party commercial insurance company.

Nevertheless, Ahwatukee argues that certain provisions in the lease agreement regarding Best Buy's insurance obligations create an ambiguity as to the meaning of "insurance" in article 9(F). Article 9(C) stated that all "policies of insurance to be procured by [Best Buy] shall be issued by insurance companies rated not less than A+VII in the most current available 'Best's Key Rating Guide,' [and] qualified to do business in the State where the Shopping Center is situated." (Id. art. 9(C).) Ahwatukee contends that article 9(C)'s express requirement for third-party commercial

20

insurance precludes an interpretation of other sections of the lease agreement to require such insurance if those sections do not contain the same provision.  See <u>Herman Chanen Constr. Co. v. Guy Apple Masonry Contractors, Inc.</u>, 453 P.2d 541, 543 (Ariz. Ct. App. 1969) (applying *expressio unius est exclusio alterius* canon to contract interpretation).  Article 9(C), however, limited the quality and location of the insurance company from which Best Buy could obtain insurance.  It did not suggest that the insurance contemplated in other sections of the lease agreement could be maintained by anything other than a third-party commercial insurer. Indeed, the use of "insurance companies" to refer to third-party commercial insurers in article 9(C) indicates that the use of "insurance companies" and "insurance carriers" in articles 9(B) and (H) of the lease agreement also referred to third-party commercial insurance companies.  Therefore, the court determines that the lease agreement unambiguously required Ahwatukee to maintain insurance from third-party commercial insurance companies.[17] Accordingly, because the first dollar program and captive coverage

---

[17] As a result, the court does not consider the extrinsic evidence submitted by Ahwatukee.  <u>See</u> <u>State v. Mabery Ranch, Co.</u>, 165 P.3d 211, 219 (Ariz. Ct. App. 2007) ("Whether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is admissible is a question of law for the court.").

did not satisfy this requirement, the court grants Best Buy's motion for summary judgment on its breach of contract and declaratory judgment claims against Ahwatukee.

### 4. Great Northern

The Great Northern lease agreement required Best Buy to pay its "proportionate share of the cost of all insurance that [Great Northern] may from time to time maintain with respect to the Shopping Center," which included, without limitation, "broad form comprehensive general liability insurance, fire, extended coverage, vandalism and malicious mischief and all-risk insurance, rent insurance and boiler and sprinkler insurance." (Pl. Ex. 12 art. 12.7(a).)[18] The court again determines that the plain meaning of Best Buy's obligation to pay its "share of the cost of insurance" includes only the cost of the "insurance," not the costs attendant to maintaining insurance on the properties. Additionally, the term "insurance" as used in the lease agreement is unambiguous and refers to insurance from a third-party commercial insurance company. Nowhere does the lease agreement contemplate the first dollar program or captive coverage. Other sections of the lease agreement, however, refer to "any insurance company," "insurance

_____

[18] This requirement excluded payment for costs "attributable to insuring the Common Areas [that were] included in [Great Northern's] Operating Costs." (<u>Id.</u> art. 12.7(b); <u>see</u> <u>id.</u> art. 9.6 (defining Operating Costs).) Nevertheless, Best Buy was also required to pay its "proportionate share of [Great Northern's] Operating Costs for each lease year." (<u>Id.</u> art. 9.5.)

policies" and payment of "premiums," all of which are associated with insurance procured from a third-party commercial insurer. (See id. art. 12.8.)  See Black's Law Dictionary 1219 (8th ed. 2004) (defining "premium" as the "periodic payment required to keep an insurance policy in effect").  Therefore, because the first dollar program and captive coverage do not satisfy the lease agreement's insurance requirements, the court grants Best Buy's motion for summary judgment on its breach of contract and declaratory judgment claims.

### 5.  Nassau Park and Cool Springs

The Nassau Park and Cool Springs lease agreements contained materially similar insurance provisions requiring the landlords to "procure and maintain ... fire and extended coverage insurance [and] public liability insurance coverage." (Pl. Exs. 9 art. 23.2; 14 art. 23(b).)  Best Buy was responsible for its proportionate share "of the premiums" for that insurance.  (Pl. Exs. 9 art. 23.2; 14 art. 23(b).)

These lease agreements unambiguously required Best Buy to pay solely for insurance premiums, not all costs associated with procuring and maintaining insurance on the properties.  Moreover, articles 23.2 and 23(b) contemplated only insurance procured from a third-party commercial insurance company.  First, as stated earlier, the term "premiums" is typically associated with payments made on insurance policies issued by third-party commercial

insurers. Second, although articles 23.1 and 23(a) explicitly contemplated Best Buy's satisfaction of its property insurance obligation through self-insurance, the lease agreements contained no similar provisions allowing the type of self-insurance provided by the first dollar program and captive coverage. Finally, similar to the Ahwatukee lease agreement, articles 23.1 and 23(a) required Best Buy to obtain insurance that was "issued by an insurance company authorized to do business in the state in which the Premises are located and rated A-7 or better by A.M. Best or an equivalent rating service." (Pl. Exs. 9 art. 23.1; 14 art. 23(a).) Although this provision limited the location and quality of the insurance company Best Buy was required to use, it does not suggest that other portions of the lease agreements contemplated the procurement and maintenance of insurance from an entity other than a third-party commercial insurance company. Therefore, the unambiguous terms of the lease agreements permitted Nassau Park and Cool Springs to charge only for premiums on third-party commercial insurance policies, and the landlords breached the agreements by charging Best Buy for the first dollar and captive premiums. Accordingly, summary judgment in favor of Best Buy is warranted on its breach of contract and declaratory judgment claims against Nassau Park and Cool Springs.

### 6. Remaining Properties

With minor variations, the remaining lease agreements required Best Buy to pay its proportionate share of the "cost of insurance." Consistent with the other lease agreements, the court determines that Best Buy was responsible for the actual cost of procuring and maintaining the required insurance, not all attendant costs. Furthermore, as discussed below, the court determines that the term "insurance" in the remaining lease agreements referred to insurance obtained from third-party commercial insurance companies.

### a. Boulevard, B-W and Lakepointe

The Boulevard lease agreement required Boulevard to "procure and maintain ... fire and extended coverage insurance ... insuring [Boulevard] and [Best Buy] (as their respective interests may appear) against loss or damage ... covered by the standard form of fire and extended coverage insurance available in the State in which the Premises are located." (Pl. Ex. 11 art. 22.2.) Boulevard also had to "procure and maintain ... public liability insurance coverage ... naming [Best Buy] as an additional insured." (Id.) The B-W and Lakepointe lease agreements contained materially similar provisions. (Pl. Exs. 10 art. 22.2; 15 art. 22.2.)

The landlords defendants' insurance obligations under these lease agreements unambiguously indicate that they were permitted to charge only for insurance policies obtained from third-party commercial insurance companies. First, Best Buy was to be an

25

insured under the fire and extended coverage policy.  Second, the lease agreements required insurance against loss or damage covered by the "standard form of fire and extended coverage insurance." Third, Best Buy was to be named as an additional insured under the liability policy.  All of these elements are typically associated with insurance procured from third-party commercial insurers.  In addition, similar to the Nassau Park and Cool Springs lease agreements, the Boulevard, B-W and Lakepointe lease agreements referred to "insurance premiums," (Pl. Exs. 10 art. 22.3; 11 art. 22.3; 15 art. 22.3), permitted Best Buy to self-insure under certain circumstances and required that Best Buy's insurance "be issued by an insurance company authorized to do business in the state in which the Premises are located," (Pl. Exs. 10 art 22.1; 11 art. 22.1; 15 art. 22.1).  For the reasons discussed above with respect to the Nassau Park and Cool Springs lease agreements, these provisions also reflect that the insurance contemplated by the Boulevard, B-W and Lakepointe lease agreements was insurance obtained from third-party commercial insurance companies. Therefore, because the first dollar program and captive coverage were not insurance issued by third-party commercial insurance companies, the court determines that Boulevard, B-W and Lakepointe breached the express terms of the lease agreements.  Accordingly,

the court grants Best Buy's motion for summary judgment on its breach of contract and declaratory judgment claims against Boulevard, B-W and Lakepointe.

### b. Riverdale, Spring Creek, Shoppers World, Flatiron, JDN Douglasville and Turner Hill

The remaining lease agreements also required that Best Buy be insured under the landlord's property insurance, referred to "standard form" coverage, provided that Best Buy be named an additional insured under the liability policy, permitted Best Buy to self-insure[19] and required Best Buy's insurance to be issued by insurance companies licensed to do business in the state in which the relevant property was located. (<u>See</u> Pl. Exs. 2 arts. 22.1, 22.2; 3 arts. 22.5, 22.6; 4 arts. 22.1, 22.2; 5 arts. 22.1, 22.2; 7 arts. 22.1, 22.2; 8 arts. 22.1, 22.2.) For the reasons discussed above, these provisions unambiguously establish that the lease agreements permitted charges solely for third-party commercial insurance. Moreover, all of the remaining lease agreements – except for Riverdale – required the landlords to provide Best Buy with a "certificate evidencing" the insurance coverage contemplated by the lease agreements. (<u>See</u> Pl. Exs. 2 art. 22.1; 3 art. 22.6;

_____

[19] The Riverdale, Spring Creek and Shoppers World lease agreements also expressly permitted the landlords to self-insure provided they or DDRC met certain net worth requirements. (Pl. Exs. 2 art. 22.2; 7 art. 22.2; 8 art. 22.2.) These landlord defendants, however, do not maintain that they met the conditions for self-insurance under the lease agreements or otherwise attempt to justify the first dollar program or captive coverage pursuant to those provisions.

4 art. 22.2; 5 art. 22.2; 7 art. 22.2; 8 art. 22.2.) This certificate requirement further supports an interpretation of the lease agreements' insurance provisions to mean third-party commercial insurance. Therefore, the court determines that the landlord defendants breached the lease agreements by charging Best Buy for the first dollar program and captive coverage. Accordingly, summary judgment in favor of Best Buy on its breach of contract and declaratory judgment claims against Riverdale, Spring Creek, Shoppers World, Flatiron,[20] JDN Douglasville and Turner Hill is warranted.

## B.   Equitable Defenses

The landlord defendants argue that even if the first dollar program and captive coverage violated the lease agreements, they are entitled to summary judgment on Best Buy's breach of contract claims under the doctrines of equitable estoppel, waiver, voluntary payment and account stated. Specifically, the landlord defendants contend that the 1998 memorandum put Best Buy on notice of the first dollar program and that the reconciliation documents for the lease years disclosed that the insurance charges were for more than premiums paid to third-party commercial insurers. Thus, the

---

[20] Although extrinsic evidence is admissible under Colorado law to establish an ambiguity, the extrinsic evidence submitted by Flatiron regarding the parties' course of performance and course of dealing, along with Best Buy's internal documents, does not create an ambiguity as to the insurance required by the lease agreements in this case.

landlord defendants maintain that by paying the invoices during the
lease years without specific objections to the insurance charges,
Best Buy is now precluded from challenging the validity of those
charges.  The court addresses the doctrines together because the
landlord defendants' arguments fail for identical reasons.

Under the doctrine of equitable estoppel, a court may estop a
party from asserting claims "to prevent [the] party from taking
unconscionable advantage of [its] own wrong by asserting [its]
strict legal rights." Brekke v. THM Biomed., Inc., 683 N.W.2d 771,
777 (Minn. 2004) (quotation omitted).  The elements of equitable
estoppel are: (1) conduct, acts, language or silence constituting
representations or omissions of material facts; (2) actual or
constructive knowledge of the material facts at the time of the
challenged action by the party estopped; (3) the party claiming the
benefit of estoppel did not know the truth about the material facts
at the time of the challenged action; (4) the action was taken with
the intent or expectation that the other party would act upon it or
that it was natural and probable that the action would be acted
upon; and (5) the other party relied to its detriment on the
challenged action. Lunning v. Land O'Lakes, 303 N.W.2d 452, 457
(Minn. 1980) (citation omitted).  "The application of equitable

estoppel is a question of fact unless only one inference can be drawn from the facts." <u>Rhee v. Golden Home Bldrs., Inc.</u>, 617 N.W.2d 618, 622 (Minn. Ct. App. 2000).[21]

Waiver is "the intentional relinquishment of a known right." <u>Valspar Refinish, Inc. v. Gaylord's, Inc.</u>, 764 N.W.2d 359, 367 (Minn. 2009) (quotations omitted). In other words, waiver is "the expression of an intention not to insist on what the law affords." <u>Id.</u> (quotation omitted). A party waives a contractual provision by acting "in a way that is inconsistent with the terms of a contract." <u>Id.</u> (citation omitted). "Waiver generally is a question of fact, and it is rarely to be inferred as a matter of law." <u>Id.</u>[22]

---

[21] The other relevant states apply materially similar standards. <u>See</u> <u>Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcon. Ins. Co.</u>, 178 P.3d 485, 493 (Ariz. Ct. App. 2008) (citing <u>Joy Enters., Inc. v. Reppel</u>, 537 P.2d 591, 594 (Ariz. 1975)); <u>Anadarko Petroleum Co. v. Venable</u>, 850 S.W.2d 302, 308 (Ark. 1993); <u>Thurman v. Tafoya</u>, 895 P.2d 1050, 1058 (Colo. 1995); <u>State Farm Fire & Cas. Co. v. Mills Plumbing Co.</u>, 263 S.E.2d 270, 273 (Ga. Ct. App. 1979); <u>Boylston Dev. Group, Inc. v. 22 Boylston Street Corp.</u>, 591 N.E.2d 157, 163 (Mass. 1992); <u>Culp v. Marshall & Melhorn</u>, 729 N.E.2d 1240, 1243 (Ohio Ct. App. 1999); <u>Schroeder v. Tex. Iron Works, Inc.</u>, 813 S.W.2d 483, 489 (Tex. 1991).

[22] The other relevant states apply materially similar standards. <u>See</u> <u>Am. Cont'l Life Ins. v. Ranier Constr. Co.</u>, 607 P.2d 372, 374-75 (Ariz. 1980); <u>Bharodia v. Pledger</u>, 11 S.W.3d 540, 545 (Ark. 2000); <u>Dep't of Health v. Donahue</u>, 690 P.2d 243, 247 (Colo. 1984); <u>Young v. Oak Leaf Bldrs., Inc.</u>, 626 S.E.2d 240, 243 (Ga. Ct. App. 2006); <u>Dynamic Mach. Works, Inc. v. Mach. & Elec. Consultants, Inc.</u>, 831 N.E.2d 875, 879 (Mass. 2005); <u>State ex rel. Wallace v. State Med. Bd.</u>, 732 N.E.2d 960, 965 (Ohio 2000); <u>In re GE Capital Corp.</u>, 203 S.W.3d 314, 316 (Tex. 2006).

An account stated is a "manifestation of assent by a debtor and creditor to a stated sum as an accurate computation of an amount due the creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent." Cherne Contracting Corp. v. Wausau Ins. Cos., 572 N.W.2d 339, 345 (Minn. Ct. App. 1997) (quotation omitted). A manifestation of assent, however, must be based on full knowledge of the manner of computation of the amount due. See id. (summary judgment inappropriate because question of fact as to plaintiff's knowledge).[23]

The voluntary payment doctrine provides that "money paid voluntarily, with full knowledge of the facts, cannot be recovered back." Joannin v. Ogilvie, 52 N.W. 217, 217 (Minn. 1892). In other words, a voluntary payment cannot be recovered on the ground that there was no legal obligation to make the payment. Thomas Peebles & Co. v. Sherman, 181 N.W. 715, 716 (Minn. 1921).[24]

_____

[23] The other relevant states apply materially similar standards. See Holt v. W. Farm Servs., 517 P.2d 1272, 1273-74 (Ariz. 1974); Foscue v. McDaniel,__ S.W.3d __ No. 08-1145, 2009 Ark. LEXIS 295, at *14-15 (Ark. Apr. 23, 2009); Polichio v. Oliver Well Works, Inc., 362 P.2d 1056, 1059 (Colo. 1961); Lawson v. Dixie Feed & Seed Co., 145 S.E.2d 820, 821-22 (Ga. Ct. App. 1965); Meredith & Grew, Inc. v. Worcester Lincoln, LLC, 831 N.E.2d 940, 947 (Mass. App. Ct. 2005) (citing Milliken v. Warwick, 28 N.E.2d 224 (Mass. 1940)); Crown Asset Mgmt., LLC v. Gaul, No. 08-30, 2009 Ohio App. LEXIS 2042, at *6-7 n.1 (Ohio Ct. App. May 1, 2009); Neil v. Agris, 693 S.W.2d 604, 605 (Tex. Ct. App. 1985).

[24] The other relevant states apply materially similar standards. See Moody v. Lloyd's of London, 152 P.2d 951, 953
(continued...)

As an initial matter, no evidence supports Best Buy's actual or constructive knowledge that the insurance charges in the reconciliation documents for the 1998 to 2003 lease years included costs for the program outlined in the 1998 memorandum. That memorandum put Best Buy on notice that the first dollar program existed. The annual reconciliations during this period, however, identified only "large deductibles" and "Self-Insured Deductible costs." The use of the term "deductible" to identify the first dollar program contradicts the 1998 memorandum's explanation that the "self-funded coverage, while similar to a deductible, is not, in fact, a deductible." (Pl. Ex. 112.) Therefore, the equitable defenses raised by the landlord defendants do not prevent Best Buy from bringing its breach of contract claim for the 1998 to 2003 lease years.

Moreover, in the September 2004 letter, Best Buy expressed concern about the CAM insurance charges and requested detailed information related to the calculation of those charges. That letter constitutes a proper objection to the charges for the first dollar program and captive coverage for the 2004 and 2005 lease

[24](...continued)
(Ariz. 1944); Douglas v. Adams Trucking Co., 46 S.W.3d 512, 518 (Ark. 2001); Skyland Metro. Dist. v. Mountain W. Enter., LLC, 184 P.3d 106, 127 (Colo. Ct. App. 2007); Yeazel v. Burger King Corp., 526 S.E.2d 112, 119 (Ga. 1999); Carey v. Fitzpatrick, 17 N.E.2d 882, 883 (Mass. 1938); State ex rel. Dickman v. Defenbacher, 86 N.E.2d 5, 7 (Ohio 1949); TCI Cablevision of Dallas, Inc. v. Owens, 8 S.W.3d 837, 844 (Tex. Ct. App. 2000).

years, and the equitable defenses are inapplicable for those years. Accordingly, the court denies the landlord defendants' motion for summary judgment on Best Buy's breach of contract claim.

## III. Fraud

DDRC, Ahwatukee, Spring Creek, Shoppers World, Flatiron and Lakepointe argue that summary judgment is warranted on Best Buy's remaining fraud claims because there is no evidence that they made any misrepresentations or reliance by Best Buy.[25] A plaintiff establishes a claim for fraudulent misrepresentation by establishing that:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance.

---

[25] The November 21, 2007, order, granting in part and denying in part defendants' motion to dismiss the fraud claims indicated that the JDN Overlook lease agreement contained a Tennessee choice-of-law provision and that the fifth amended complaint properly asserted a claim for fraud under Tennessee law. (Doc. No. 530 at 22-23.) The lease agreement in the summary judgment record, however, contains no choice-of-law provision. (Pl. Ex. 13.) Therefore, consistent with the November 21, 2007, order, the court determines that Minnesota and Ohio law preclude Best Buy's fraud claim against JDN Overlook because "the only damages alleged by Best Buy are for the overpayment of insurance charges under the lease agreement." (Doc. No. 530 at 14.)

Hoyt Props., Inc. v. Prod. Res. Group, LLC, 736 N.W.2d 313, 318 (Minn. 2007) (quotation omitted).[26]

## A.    False Representation

Defendants argue that the reconciliation documents contained no false representations because they disclosed that the insurance charges were for more than premiums on insurance policies obtained from third-party insurance companies.  Best Buy asserts that the reconciliation documents falsely stated that certain charges were for insurance, when in fact they included charges for the first dollar premiums and captive premiums in addition to the premiums on the blanket insurance policies.

Before the 2002 lease year, the reconciliation documents indicated that the charges were for "insurance" and included funding for "large deductibles" collected by DDRC.  In light of the court's interpretation of the lease agreements' "insurance" provisions, the court determines that the use of "insurance" to refer to the first dollar program was a misrepresentation.[27]

---

[26] The other relevant states apply materially similar standards.  Dawson v. Withycombe, 163 P.3d 1034, 1046 (Ariz. Ct. App. 2007); Archer-Daniels-Midland Co. v. Beadles Enters., Inc., 238 S.W.3d 79, 83 (Ark. 2006); Coors v. Sec. Life of Denver Ins. Co., 112 P.3d 59, 66 (Colo. 2005); Masingill v. EMC Corp., 870 N.E.2d 81, 88 (Mass. 2007); State ex rel. Illuminating Co. v. Cuyahoga County Ct. of Common Pleas, 776 N.E.2d 92, 97-98 (Ohio 2002); Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994) (per curiam).

[27] In addition, to the extent Best Buy asserts that defendants' use of "coverage" was also false because it was synonymous with
(continued...)

Moreover, reference to "deductibles" to refer to the first dollar premiums was misleading because, by DDRC's own admission, the first dollar premiums were not deductibles. For the same reasons, the 2002 and 2003 reconciliation documents' references to "deductible cost" and "self-insured deductible" were misleading. For the 2004 and 2005 lease years, however, the reconciliation documents distinguished between insurance charges for the blanket policies and charges for the first dollar program and captive coverage. Based on the reconciliation documents' express identification of the first dollar program and its associated charges, together with Best Buy's receipt of the 1998 memorandum, the court determines that defendants made no false statements related to insurance charges for the 2004 and 2005 lease years.

**B.   Reliance**

Defendants further maintain that Best Buy's fraud claims fail because Best Buy has not identified any specific individuals who relied on the references in the reconciliation documents to "insurance." Best Buy responds that its review process permits an inference that Best Buy, as an institution, relied on the representations in the reconciliation documents when it made payments.

---

[27](...continued)
"insurance," the court determines that "coverage" is ambiguous and its meaning presents a fact question for resolution by a jury.

On November 21, 2007, the court denied defendants' motion to dismiss Best Buy's fraud claims for lack of particularity. In that order, the court held that "[a]lthough Best Buy has not identified the individuals who received and relied upon the allegedly fraudulent documents, it has identified the party that received the representation - i.e., Best Buy." (Doc. No. 530 at 8.) Consistent with that statement, the court determines that the evidence in the summary judgment record regarding Best Buy's review process permits an inference of reliance. Therefore, based on the above, the court denies defendants' motion for summary judgment on the fraud claims for the 1998 to 2003 lease years, and grants the motion for the 2004 and 2005 lease years. Accordingly, summary judgment is granted in favor of JDN Overlook and Flatiron,[28] and granted in part and denied in part as to the remaining defendants.

## IV. Breach of Fiduciary Duty

Applying Minnesota, Arizona, Colorado, Texas, Ohio and Massachusetts law, the court denied defendants' motion to dismiss Best Buy's breach of fiduciary duty claims on December 8, 2006, because dismissal of those claims as a matter of law was premature. (Doc. No. 177 at 12-24.) Defendants now claim that summary judgment is appropriate on the breach of fiduciary duty claims because the lease agreements created no special circumstances to transform an arms-length transactions between sophisticated

---

[28] Flatiron's relevant lease years are 2004 and 2005.

business entities into a fiduciary relationship.  Best Buy, on the other hand, maintains that summary judgment is warranted in its favor because the lease agreements required it to repose trust in defendants to properly procure and maintain insurance with Best Buy's money.

To establish a breach of fiduciary duty claim, a plaintiff must prove the existence of a fiduciary duty, breach of that duty, causation and damages.  <u>Conwed Corp. v. Employers Reins. Corp.</u>, 816 F. Supp. 1360, 1362 n.3 (D. Minn. 1993).  Under Minnesota law, whether a fiduciary relationship exists is a question of fact. <u>Toombs v. Daniels</u>, 361 N.W.2d 801, 809 (Minn. 1985).  "A fiduciary relationship exists 'when confidence is reposed on one side and there is resulting superiority and influence on the other.'"  <u>Id.</u> (quoting <u>Stark v. Equitable Life Assur. Soc'y</u>, 285 N.W. 466, 470 (Minn. 1939)).  Evidence of business experience disparities, financial control, repeated assurances and invited confidences may suffice to show a fiduciary relationship.  <u>Id.</u>; <u>Kennedy v. Flo-Tronics, Inc.</u>, 143 N.W.2d 827, 830 (Minn. 1966); <u>Gibson v. Coldwell Banker Burnet</u>, 659 N.W.2d 782, 788 (Minn. Ct. App. 2003); <u>see also Hope v. Klabal</u>, 457 F.3d 784, 791-92 (8th Cir. 2006).  A fiduciary relationship does not exist, however, by one party merely having faith and confidence in another where the former should have known

the latter was representing an adverse interest.  S. Minn. Mun. Power Agency v. City of St. Peter, 433 N.W.2d 463, 468 (Minn. Ct. App. 1988).[29]

The parties in this case are sophisticated business entities that engaged in arms-length commercial transactions knowing that they represented adverse interests.  Although the lease agreements required Best Buy to pay the landlords - who in turn paid DDRC - for obtaining insurance policies on the properties, the record establishes that Best Buy did not simply trust defendants to act in their interest.  First, Best Buy's review process involved a first-level audit of the reconciliation documents, intense scrutiny of the charges on a second-level audit and objections to many of the charges.  For example, Best Buy challenged charges at the Riverdale property for the 2002 lease year related to landscaping, the retention area, sweeping, maintenance supplies, signage, truck

---

[29] As relevant to this case, the other states' laws are materially similar.  See Taeger v. Catholic Family & Cmty. Servs., 995 P.2d 721, 727 (Ariz. Ct. App. 1999); Standard Chartered PLC v. Price Waterhouse, 945 P.2d 317, 335 (Ariz. Ct. App. 1996); Tex. Oil & Gas Corp. v. Hawkins Oil & Gas, Inc., 668 S.W.2d 16, 17 (Ark. 1984); Turkey Creek, LLC v. Rosania, 953 P.2d 1306, 1312 (Colo. Ct. App. 1998); Meyer v. Schwartz, 638 P.2d 821, 822 (Colo. Ct. App. 1981); Arp v. United Cmty. Bank, 612 S.E.2d 534, 538 (Ga. Ct. App. 2005); Bienert v. Dickerson, 624 S.E.2d 245, 248-49 (Ga. Ct. App. 2005);  Yarbrough v. Kirkland, 548 S.E.2d 670, 673 (Ga. Ct. App. 2001); Doe v. Harbor Schs., Inc., 843 N.E.2d 1058, 1064 (Mass. 2006); Ed Schory & Sons Inc. v. Francis, 662 N.E.2d 1074, 1081 (Ohio 1996) (internal quotations omitted); Depugh v. Ohio Dep't of Commerce, 715 N.E.2d 622, 625 (Ohio Ct. App. 1998); Spalding v. Coulson, 661 N.E.2d 197, 209 (Ohio Ct. App. 1995); Meyer v. Cathey, 167 S.W.3d 327, 330-31 (Tex. 2005).

expenses, plumbing and electricity repairs, fire protection, energy management, maintenance services, water/sewer, gas, telephone, access roads and other miscellaneous items. These challenges ranged from a $3.00 charge for keys to a $27,064.00 charge for maintenance services. (Defs. Ex. X.)

Second, the lease agreements expressly provided Best Buy with the right to audit the charges. Best Buy now claims that the audit provisions were meaningless because defendants ignored its requests for information. If that was the case, Best Buy had a contractual remedy. The important point is that the lease agreements established the relationship between the parties, and the audit provisions indicate that Best Buy did not simply repose confidence in defendants that resulted in defendants' superiority and influence.

Finally, most of the lease agreements explicitly disclaimed a fiduciary relationship. For example, the Boulevard lease agreement provided that

> Nothing contained in this Lease shall be deemed or construed by the parties hereto or by a third party to create the relationship of principal and agent or of partnership or of joint venture of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the method or computation of rent nor any other provision contained herein, nor any act or acts of the parties hereto, shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and tenant.

39

(Pl. Ex. 11 art. 31; <u>see also</u> Pl. Exs. 2 art. 40.4; 3 art. 37.4, 4 art. 37.4; 5 art. 37.4; 7 art. 40.4; 8 art. 40.4; 9 art. 32; 10 art. 31; 14 art. 32; 15 art. 30.)  Although not dispositive, these provisions again reflect the arms-length commercial relationship between the parties.  Therefore, based on the present record, the court determines that defendants did not owe Best Buy a fiduciary duty, and summary judgment is warranted in favor of defendants on this claim.[30]

## V.   Statute of Limitations

Finally, defendants argue that Best Buy's breach of contract, declaratory judgment and remaining fraud claims that accrued before April 11, 2000,[31] are time-barred by Minnesota's six-year statute of limitations.[32]  <u>See</u> Minn. Stat. § 541.05, subdivs. 1(1), 1(5). A cause of action accrues "when the right to institute and maintain a lawsuit arises."  <u>Levin v. C.O.M.B. Co.</u>, 441 N.W.2d 801, 803

---

[30] The parties' sophisticated status, Best Buy's review process and the terms of the lease agreements all distinguish this case from the principal cases relied upon by Best Buy.  <u>See</u> <u>Divizio v. Kewin Enters., Inc.</u>, 666 P.2d 1085 (Ariz. Ct. App. 1983); <u>P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship</u>, 549 A.2d 403 (Md. Ct. Spec. App. 1988); <u>see also</u> <u>Hurt v. Schneider</u>, 156 P. 600 (Colo. 1916).

[31] The court's November 21, 2007, order determined that the fifth amended complaint related back to the first amended complaint, which was filed on April 11, 2006.  (Doc. 530 at 24 n.16.)

[32] As noted in the November 21, 2007, order, Minnesota law governs "because the statutes of limitations are procedural matters relating to remedies and are governed by the forum state."  (<u>Id.</u> at 23.)

(Minn. 1989). The statute of limitations period is tolled by fraudulent concealment "until discovery or reasonable opportunity for discovery of the fact by the exercise of ordinary diligence." Wild v. Rariq, 234 N.W.2d 775, 795 (Minn. 1975); see also Kassan v. Kassan, 400 N.W.2d 346, 349 (Minn. Ct. App. 1987) (facts constituting fraud considered discovered when they could and ought to have been discovered by reasonable diligence). A plaintiff establishes fraudulent concealment by showing an affirmative statement that concealed a potential cause of action, that the statement was known to be false or made with reckless disregard for the truth and that the concealment could not have been discovered through reasonable diligence. Haberle v. Buchwald, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992).

In this case, the reconciliation documents for the 1998 through 2003 lease years indicated that the insurance charges were for premiums and large deductibles or self-funded deductibles. As noted earlier, these representations directly contradicted the 1998 memorandum. Moreover, after receiving the 2004 reconciliation documents, which identified the "First Dollar Program," Best Buy began an investigation into the charges that ultimately led to this lawsuit. Therefore, the court determines that a fact issue remains as to whether equitable tolling is warranted because Best Buy was reasonably diligent in pursuing its claims once it had reason to challenge the nature of the charges. See Appletree Square I Ltd.

*P'ship v. Investmark, Inc.*, 494 N.W.2d 889, 894 (Minn. Ct. App. 1993) (reasonable diligence generally question of fact). Accordingly, the court denies defendants' motion for partial summary judgment on Best Buy's remaining claims.

## CONCLUSION

Based upon the above, **IT IS HEREBY ORDERED** that:

1.  Best Buy's motion for summary judgment [Doc. No. 652] is granted in part and denied in part.

    a.  Best Buy's motion for summary judgment on its breach of contract claim is granted.

    b.  Best Buy's motion for summary judgment on its declaratory judgment claim is granted.

    c.  Best Buy's motion for summary judgment on its breach of fiduciary duty claim is denied.

2.  Defendants' motion for summary judgment [Doc. No. 657] is granted in part and denied in part.

    a.  Landlord defendants' motion for summary judgment on Best Buy's breach of contract claim is denied.

    b.  DDRC, Ahwatukee, Spring Creek, Shoppers World, and Lakepointe's motion for summary judgment on Best Buy's fraud claims is denied in part and granted in part.

    c.  Flatiron and JDN Overlook's motion for summary judgment on Best Buy's fraud claim is granted.

     d.    Defendants' motion for summary judgment on Best Buy's breach of fiduciary duty claim is granted.

Dated:  July 14, 2009

                                 s/David S. Doty
                                 David S. Doty, Judge
                                 United States District Court